Douglas E. Mirell (SBN 94169)
~~dmirell@nolanheimann.com~~
dmirell@nolanheimann.com
Jordan D. Susman (SBN 246116)
~~jsusman@nolanheimann.com~~
jsusman@nolanheimann.com
NOLAN HEIMANN LLP
16000 Ventura Boulevard, Suite 1200
Encino, California 91436
Telephone: (818) 574-5710

Ina B. Scher (admitted *pro hac vice* ~~forthcoming~~)
~~ischer@dglaw.com~~
~~David Greenberg (*pro hac vice* forthcoming)~~
~~dgreenberg@dglaw.com~~ischer@dglaw.com
DAVIS+GILBERT LLP
1675 Broadway
New York, New York 10019
(212) 468-4800

*Attorneys for Plaintiffs Valnet Inc.*
*and Hassan Youssef*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALNET INC. and HASSAN YOUSSEF, <br><br> Plaintiffs, <br><br> vs. <br><br> THE WRAP NEWS INC. and UMBERTO GONZALEZ, <br><br> Defendants. | Case No.: 2:26-cv-00461-SB-PVC <br><br> **THIRD AMENDED COMPLAINT** <br><br> Judge:  Hon. Stanley Blumenfeld Jr. <br> Courtroom:  6C <br> Action Filed:  April 25, 2025 <br><br> **DEMAND FOR JURY TRIAL** |

- 1 -

THIRD AMENDED COMPLAINT

Plaintiffs Valnet Inc. ("Valnet," or "the Company") and Hassan Youssef (together with Valnet, collectively "Plaintiffs"), by and through their attorneys, Nolan Heimann LLP and Davis+Gilbert LLP, for their Third Amended Complaint against defendantdefendants The Wrap News Inc. ("The Wrap") and Umberto Gonzalez ("Gonzalez") (together with The Wrap, collectively "Defendants"), allege as follows:

## NATURE OF THE ACTION

1. This action arises out of the malicious tortious conduct of The Wrap's online media outlet, "TheWrap," and its reporter Umberto Gonzalez.Umberto Gonzalez, "senior film reporter at TheWrap, covering film & television development, agencies and talent" ("Gonzalez")  On March 20, 2025, TheWrap[1] published an inflammatory hit piece by Gonzalez, provocatively titled *Valnet Blues: How Online Porn Pioneer Hassan Youssef Built a Digital Media 'Sweatshop'* (the "March 2025 Article").

2. The March 2025 Article smeared both Valnet and its Chief Executive Officer and Co-Founder Hassan Youssef ("Youssef"), for the purpose of tarnishing their reputations, thereby giving The Wrap a commercial advantage over Valnet, a business competitor.

3. Defendants intended that the March 2025 Article attack the integrity of Youssef and Valnet, which the March 2025 Article accomplished with willful disregard for the inaccuracy of the statements it contains and the false impressions its strategic omissions impart to readers.

4. In addition, to attract attention to its hit piece, TheWrap exploited Valnet's copyrighted photographs—without permission or justification—and included them as part of its smear job against Plaintiffs.

---

[1] As used herein, "The Wrap" refers to the Defendant publisher, while "TheWrap" refers to Defendant's publication.

- 2 -

5.      Following the publication of the defamatory March 2025 Article and the initiation of this action, Defendants continued their wrongful conduct by publishing subsequent inflammatory, defamatory, and inaccurate content about Valnet.

6.      Defendants' repudiation of basic journalistic standards has caused Valnet injury.  Following TheWrap's release of the March 2025 Article, Valnet received concerned inquiries from vendors and industry partners; a high-profile partner for an event hosted by a Valnet brand declined to pursue plans to include the Valnet brand in the event and to significantly expand the event; a prominent film studio canceled another event planned with a Valnet brand; a financial institution declined to extend Valnet millions of dollars in financing, in a transaction that was approaching closure at the time of the March 2025 Article; other partners expressed significant concerns regarding pending transactions with Valnet; and still others have expressed their wish not to be associated with the Valnet brand.   In addition, persons who agreed to interviews with Valnet journalists backed out of those commitments, and candidates for senior editorial positions at Valnet declined employment offers. In each instance, the vendors, partners, interviewees, and employment candidates identified or alluded to the false and misleading March 2025 Article as a reason, or the *only* reason, for their actions.

7.      At the same time, Defendants' false statements have undermined Youssef's credibility and his business relationships, and the trust of his peers in the business community.  They further have caused him emotional distress in his personal life, adversely affecting various aspects of his relationships with others.

8.      Upon information and belief, injuring Youssef and gaining this unfair business advantage over Valnet, through loss of readers, business partners, advertisers and staff, was precisely Defendants' motive for publishing the March 2025 Article, as further demonstrated by their subsequent publication of additional defamatory articles in the months since the initiation of this action.

THIRD AMENDED COMPLAINT

## PARTIES

9.     Valnet is a Canadian corporation with its principal place of business in Montréal, Québec.  Founded in 2012 in Montréal, Valnet is a digital publishing and media investment company whose mission is to deliver high quality content to audiences through its many portfolio publications – including those covering the entertainment and media industries.

10.    Youssef is a resident of Montréal, Québec.  Youssef is the Co-Founder and Chief Executive Officer of Valnet.

11.    Upon information and belief, The Wrap is a Delaware corporation with its principal place of business in Los Angeles, California.  The Wrap describes itself on its website as "the leading, authoritative digital news organization covering the business of entertainment and media."

12.    Upon information and belief, Gonzalez is a resident of Los Angeles, California.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, inasmuch as at least one of the claims arises under the laws of the United States.  Further, the Court has jurisdiction over the other claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal law claim that they form part of the same case or controversy.

14.    In addition, pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction over this action because the amount in controversy exceeds $75,000 exclusive of interest and costs, and the dispute is between citizens of a state and subjects of a foreign state.

15.    On December 31, 2025, the United States District Court for the District of Delaware exercised its discretion and ordered that venue of this case be transferred to this Court pursuant to 28 U.S.C. § 1404, based, *inter alia*, on The Wrap's preference

- 4 -

THIRD AMENDED COMPLAINT

to litigate in this district, which is The Wrap's principal place of business, as well as the presence of potential witnesses residing in or near this district.

## FACTUAL ALLEGATIONS

**A.     Defendants Maliciously Published the March 25 Article and Subsequent Articles ~~that~~That Other Press Outlets Are Republishing and ~~to~~To Which They Are Directing Readers**

16.    Valnet and The Wrap are direct competitors, both seeking to attract readers of entertainment news to their respective publications. As such, any loss of credibility or other reputational harm suffered by Valnet will result in a direct competitive advantage for The Wrap.

17.    On March 20, 2025, TheWrap published the actionably defamatory and harmful March 2025 Article. A true and correct copy of the March 2025 Article is attached hereto as Exhibit "A."

18.    TheWrap presented the March 2025 Article as a work of investigative journalism. In actuality, however, the March 2025 Article prioritized sensationalism at the expense of an accurate narrative.

19.    As further detailed below, the March 2025 Article contains false, misleading, derogatory, and other highly prejudicial statements and material omissions regarding Youssef and, by extension, Valnet. As a result of these statements and omissions, coupled with the March 2025 Article's overall outraged tenor, the March 2025 Article communicates to the ordinary reader that Valnet is run by an unethical, greedy, and corrupt executive—namely, Youssef—thereby damaging the reputations of both Youssef and Valnet.

20.    The March 2025 Article has been widely shared by press outlets in various media and continues to be republished and reported by other news outlets and on social media.

- 5 -

THIRD AMENDED COMPLAINT

21.    For example, online news outlet Clownfish TV published an article and a video report excerpting the March 2025 Article and referring to the Article as a "bombshell exposé" on Valnet.

22.    As of the date of this amended complaint, videos discussing the March 2025 Article have been widely viewed.  For example, the Clownfish TV report has been viewed over 53,000 times and liked by over 3,200 users.

**B.    The March 2025 Article Infringes on Valnet's Copyrights**

23.    In publishing the March 2025 Article, The Wrap used two of Valnet's copyrighted images (the "Images") to increase the appeal of the March 2025 Article.

24.    The first Image is a "head shot" photograph of Youssef (the "Head Shot"), a foreign work in which Valnet owns the copyright.  The Head Shot is featured prominently above the March 2025 Article's headline at the very top of the March 2025 Article.  The Head Shot originally appeared on Youssef's LinkedIn profile and/or on Valnet's corporate website.

25.    The second Image is a photograph of Youssef speaking at Valnet's 10th anniversary party in Montréal (the "Anniversary Photo"), another foreign work in which Valnet owns the copyright.  The Anniversary Photo appears prominently near the conclusion of the March 2025 Article.  The Anniversary Photo originally appeared on Youssef's LinkedIn page.

26.    The Wrap used the Images without permission or authorization from Valnet, and without any legal justification.

**C.    The March 2025 Article Defames Youssef and Valnet**

27.    The March 2025 Article attacks Valnet by portraying its Co-Founder and Chief Executive Officer, Youssef—whom Gonzalez characterizes in the March 2025 Article as "little-known" in the entertainment world and someone who has "maintained a low profile and stayed under the radar"—as an immoral businessman seeking enrichment at all costs, and especially at the expense of ethical business practices.

THIRD AMENDED COMPLAINT

28.    As the title of the March 2025 Article makes clear, TheWrap sought to portray Youssef and Valnet in a negative light, calling Youssef an "online porn pioneer" (thereby characterizing Youssef's early investment in several adult entertainment websites in a manner intended to evoke stereotypes about the pornography industry, and undermining Youssef's character and the reputation of Valnet), while also stating that he "built a digital media 'sweatshop'" when he created Valnet.

29.    The March 2025 Article creates the negative inference that Youssef was or is personally involved in or responsible for various serious, appalling, and criminal events alleged throughout.  The March 2025 Article is replete with such allegations.

30.    For example, the March 2025 Article refers to a video uploaded by a user of the video-sharing website Pornhub in 2009 depicting the rape of a 14-year-old (the "Video"), which the victim repeatedly pleaded with Pornhub to take down, but which Pornhub initially failed to do.

31.    The March 2025 Article places this discussion immediately after asserting that Youssef and his brother operated their business affairs through a supposedly "complex web of corporate entities," and prior to falsely alluding that Youssef was actively involved in Pornhub until 2010.  This constructed timeline effectively implicates Youssef in the horrifying failure of Pornhub to immediately remove the Video from its website.  The false association of Youssef with both the Video incident and the operation of Pornhub is highly prejudicial to Youssef and thereby to Valnet, severely damaging the reputation of both.

32.    The Wrap and Gonzalez knew or should have known that Youssef had nothing to do with the Video, its existence on Pornhub, or its delayed removal from Pornhub.  Indeed, Gonzalez never sought comment on this incident from Valnet or Youssef, in reckless disregard of the truth or falsity of the allegations TheWrap published.

THIRD AMENDED COMPLAINT

33.   In fact, in 2009, at the time the Video was created and uploaded to Pornhub, a company called Interhub operated Pornhub. Youssef's company, Mansef Inc., was merely a minority investor in Interhub, and Youssef had no knowledge of, let alone control over, the day-to-day operations of Pornhub. Interhub sold its interest — and thus, Mansef's indirect interests — in Pornhub in 2010. Indeed, it was not until in or around 2020, when the initial failure of Pornhub to remove the Video from its website became public, that Youssef first learned of the Video and its former presence on Pornhub.

34.29. In its efforts to tarnish Youssef, the March 2025 Article also falsely asserts that Youssef and his brother paid millions of dollars as a fine in connection with money laundering accusations against them.

35.30. In fact, neither Youssef nor any of his businesses has ever been accused of money laundering, nor has Youssef or any of his businesses ever paid any fine in connection with any criminal conduct.

36.31. The event the March 2025 Article falsely refers to as alleged "money laundering" was, in reality, not money laundering, but rather a licensing oversight—civil, not criminal, in nature—in which a fiscal agent for Youssef's company neglected to obtain a money-transmitting license required for operations in the State of Georgia. The United States government seized certain funds held in that fiscal agent's accounts as a result and initiated a civil forfeiture action against those funds. Youssef's company and the fiscal agent voluntarily appeared in the civil case as interested parties seeking to have the funds released.

37.32. Ultimately, the parties settled this licensing dispute. Neither Youssef nor his company or its fiscal agent admitted any wrongdoing. The Government released over $4 million of the funds, and the balance was forfeited.

38.33. Notably, the true facts concerning the civil forfeiture action are a matter of public record. The pleadings, the settlement and the Consent Order of the United States District Court for the Northern District of Georgia for the civil action are all

- 8 -

THIRD AMENDED COMPLAINT

easily obtainable by the general public on the Court's docket.  Thus, anyone interested in accurately portraying the facts concerning the action and its resolution, including Defendants, could easily have investigated and determined what actually occurred.

39.34. Instead, however, Defendants crowdsourced their facts from—and in the March 2025 Article explicitly referenced as their authority—an online bulletin board forum for enthusiasts of adult entertainment, named "GoFuckYourself.com." Predictably, the anonymous posts on GoFuckYouselfGoFuckYourself.com were not a reputable or reliable source of information on government investigations and judicial decisions.

40.35. Gonzalez's failure to research and accurately report readily available facts, his failure to seek comment from Youssef or Valnet on his money laundering claims, and TheWrap's decision instead to publish incomplete and misleading information, show, at best, an obvious abandonment of basic journalistic standards, a reckless disregard for accurate reporting, and purposeful avoidance of and/or willful blindness toward the truth – if not an intentional misstatement of fact.

**D.    The March 2025 Article Reflects Defendants' Intent to Disparage and Discredit Youssef and Valnet**

41.36. The tone of the March 2025 Article as a whole further illustrates Defendants' heavily biased reporting, and intention to tarnish Valnet's reputation. Among other things, it taints Valnet's CEO and Co-Founder Youssef by characterizing him as evasive, immoral, and untrustworthy, and it portrays Valnet as lacking in credibility, disregarding media standards, producing subpar content, and engaging in exploitative business and employment practices.

42.37. For example, by stating that "the Youssef brothers have scrubbed any mention of Mansef or their adult entertainment origins from their public personas on the Valnet site," the March 2025 Article suggests that Valnet is selectively reporting, and deliberately concealing, Youssef's professional background, which casts Youssef in a suspicious light, as someone with something to hide.  In reality, Youssef has not

"scrubbed" or removed any information from the Valnet website.  Valnet has never featured biographical information for any of its employees on its website, making TheWrap's false implication that Youssef and Valnet are actively trying to deceive the public both unfounded and damaging.

43.38. Elsewhere, the March 2025 Article characterizes Youssef's prior businesses as operating through a "complex web of corporate entities."  In actuality, the corporate structure of Youssef's business holdings has never been "complex" nor a "web."  The structure is and always has been straightforward and common; contrary to the Article's implication, it was never intended to deceive or hide.  Defendants weaponize this baseless claim in the March 2025 Article to convince readers that Youssef and Valnet are untrustworthy.

44.39. The March 2025 Article further refers to Valnet and its portfolio companies as "sweatshops" where contractors are paid "bargain-basement" rates, are "exploited and discarded," and are directed to prioritize "mass quantity over quality to churn out mind-numbing SEO bait."  This inflammatory language is not only false, it is also highly prejudicial to Valnet's business reputation and to that of Youssef, as Valnet's CEO.

45.40. The March 2025 Article's false depiction of Valnet as unserious and lacking professionalism is further exemplified by Gonzalez's mischaracterization of his request to Valnet for comment on his assertions pending in the March 2025 Article regarding Valnet's employment practices.  By falsely stating that a Valnet spokesperson responded that he was unavailable for comment on these issues because "he was on vacation," the March 2025 Article portrays the Company as evasive and unprofessional.  In fact, the Valnet employee in question—who was not an authorized Valnet spokesperson, but rather an editorial employee who Gonzalez knew and to whom Gonzalez reached out directly—made a good faith effort to respond to TheWrap's request for comment, asking Gonzalez to provide specific, coherent

THIRD AMENDED COMPLAINT

questions in writing for the Company to answer (while incidentally noting that he was out of the office).  No such specific or coherent questions were ever proffered.

46.41. Defendants repeatedly opted to convey to readers of the March 2025 Article an impression of Youssef and Valnet that maximized sensationalism and advanced Defendants' preconceived, biased, and defamatory narrative, without regard to the true facts, and for their own commercial and competitive benefit.

42.     On or about March 24, 2025 (within the timeframe specified by California Civil Code Section 48a), Jonathan N. Auerbach, Esq., counsel for Valnet and Youssef, authored and caused a five-page letter to be emailed and personally delivered by a process server to The Wrap.  That letter—which sought a retraction and correction of the March 2025 Article—was addressed to both Sharon Waxman, The Wrap's CEO and founder, and to Gonzalez.  Subsequent to the transmittal of this March 24th letter, no retraction or correction of the March 2025 Article was ever made or published by The Wrap or Gonzalez.

**E.     Defendants Continue Their Vendetta Against Valnet and Youssef**

47.43. On May 9, 2025, Defendants published a second harmful article regarding Valnet, also written by Gonzalez (the "May 2025 Article").  (A true and correct copy of the May 2025 Article is attached hereto as Exhibit "B.")  The May 2025 Article, entitled "You're a Problematic and Emotional Woman: Former Valnet Employees Detail Work Experiences, Exclusive" presents a false picture of a toxic workplace culture at Valnet and its portfolio companies.

48.44. The May 2025 Article further demonstrates Defendants' zealous campaign of vilification against Valnet and Youssef, and Defendants' willful disregard for the truth.

49.45. For example, the May 2025 Article attributes a number of damaging statements to Valnet employees premised upon false and unsubstantiated information provided to them by Lissete Lanuza-Saenz, a former contributor to one of Valnet's publications.

- 11 -
THIRD AMENDED COMPLAINT

50.46. The May 2025 Article alleges that Mars Monnier, general manager of Valnet's entertainment portfolio, told Ms. Lanuza-Saenz, in the context of a conversation about another Valnet contributor who was struggling to meet her quota as a result of a disability ("Jane Doe"): "It's not our job to accommodate for her", "[y]ou're, you're being a problematic and emotional woman", "[y]ou, you need to calm down."

51.47. In fact, according to Mr. Monnier and George Edelman, another Valnet employee present during that conversation, Monnier never made these statements.

52.48. Defendants' reliance on the recollection of Ms. Lanuza-Saenz, a disgruntled former Valnet contributor, without further substantiation, demonstrates a willful and deliberate refusal to seek out truthful, non biasedunbiased sources. Indeed, Defendants proceeded to publish the May 2025 Article despite the fact that Jane Doe declined to comment on it. This decision represents a disregard for journalistic norms and Defendants' preference for sensationalized narratives rather than substantiated facts from multiple or credible sources.

53.49. Overall, the May 2025 Article portrays Valnet and its publications as promoting a workplace culture of gender discrimination. For instance, the May 2025 Article cites an anonymous source's statement that they "have no doubt that [Monnier] is a misogynist," and Ms. Lanuza-Saenz's theory that she was passed over for a promotion which was ultimately given to a less qualified man – both of which are opinions reported in the guise of facts.

54.50. The May 2025 Article also mischaracterizes a restructuring that took place at one of Valnet's publications in 2024.

55.51. For instance, the May 2025 Article misstates that Valnet laid off 75% of the staff at CBR. Citing an article calling this "The Memorial Day massacre," the Defendants continue resorting to sensationalism. In fact, Valnet laid off only one employee at the time, and ended only two freelance contributor contracts. In all, this

so-called "massacre" represented <u>roughly 5%</u> of the total CBR staff—not 75%, as Defendants reported.

~~56.~~52. Similarly, the May 2025 Article makes misleading claims about demotions at Valnet and its publications, including a claim by Jeannette White that Valnet demoted her from her position at CBR without clear notification and that Valnet HR refused to respond to Ms. White's emails. In fact, Ms. White received notification of her new responsibilities from HR.

~~57.~~53. On September 12, 2025, TheWrap published ~~an~~another actionably defamatory and harmful article targeting Valnet and its portfolio companies, entitled "Military.com 'Effectively Dead' After Valnet Forces Big Layoffs, Newsroom Union Says" (the September 2025 Article, collectively with the March 2025 Article and the May 2025 Article, are hereinafter referred to as the "Articles").  A true and correct copy of the September 2025 Article is attached hereto as Exhibit "C."

~~58.~~54. The September 2025 Article contains harmful falsehoods about Valnet which have had and are likely to have a severely negative impact on Valnet's business~~,~~—including its ability to attract <u>readers and </u>advertisers, <u>recruit and retain quality talent,</u> secure funding<u>,</u> and to consummate merger and acquisition transactions.

~~59.~~55. The September 2025 Article contains a number of serious and damaging inaccuracies about Military.com.[2]

---

[2] From the very outset, the September 2025 Article inaccurately reports that Valnet "acquired" Military.com. In truth, the site was acquired in August 2025 by Iron Corp US Inc. ("Iron Corp"), a fact which was easily verifiable through publicly<u>_</u> available court documents pertaining to the bankruptcy proceeding through which the site was sold.  Iron Corp owned and operated Military.com at the time the September 2025 article was published, and continues to operate the site today.  This readily verifiable factual inaccuracy, also ~~apparent~~<u>immediately ascertainable</u> from the Military.com website's own "User Agreement" (https://www.military.com/about-us/user-agreement) and "Privacy Policy" (https://www.military.com/about-us/privacy-policy~~)~~<u>)</u><u>,</u> further demonstrates TheWrap's failure to investigate and its willful blindness in its reporting about Valnet and its affiliates.

<u>THIRD </u>AMENDED COMPLAINT

60.56. The September 2025 Article suggests that Military.com is "effectively dead." This is untrue. In fact, Military.com continues to perform well. Even a cursory review of Military.com would have shown that it is an active publication, with an experienced editorial team of employees and freelance writers publishing important, original news articles on the site consistently, including, at or about the time of the September 2025 Article, multiple lengthy, carefully reported articles on a wide range of topics, including the Pentagon,[3] Capitol Hill,[4] and the Veterans Administration.[5]

---

[3] The following are links to a sample of then-recent articles published on Military.com reporting on the Pentagon: Trump Gives DoD 'Secondary' Name as Department of War, Circumventing Congress <https://www.military.com/daily-news/2025/09/05/trump-gives-dod-secondary-name-department-of-war-circumventing-congress.html>; Pentagon to Begin Screening for 'Magic Mushroom' Use <https://www.military.com/daily-news/2025/09/02/pentagon-begin-screening-magic-mushroom-use.html>; Air Force Chief'sChief's Sudden Retirement Raises Question of 'Who Is Next' in Leadership Shake-Up <https://www.military.com/daily-news/2025/08/19/air-force-chiefs-sudden-retirement-raises-question-of-who-next-leadership-shake.html>; and Pentagon Shifting $200 Million to Border Wall Project in Arizona <https://www.military.com/daily-news/2025/07/28/pentagon-shifting-200-million-border-wall-project-arizona.html>.

[4] The following are links to a sample of then-recent articles published on Military.com reporting on Capitol Hill: Senate Democrat Tries to Formally Condemn Funeral Honors for Ashli Babbitt <https://www.military.com/daily-news/2025/09/10/senate-democrat-tries-formally-condemn-funeral-honors-ashli-babbitt.html>; Senate Confirms Former Chair of Veterans Appeals Board as VA Inspector General <https://www.military.com/daily-news/2025/07/31/senate-confirms-former-chair-of-veterans-appeals-board-va-inspector-general.html>; Proposal to Expand Private Veterans Health Care Pared Down in Bipartisan Senate Compromise <https://www.military.com/daily-news/2025/07/31/proposal-expand-private-veterans-health-care-pared-down-bipartisan-senate-compromise.html>; and VA Memorial Affairs Leader Approved by Senate <https://www.military.com/daily-news/2025/07/30/va-memorial-affairs-leader-approved-senate.html>>.

[5] In addition to articles listed in the preceding footnote that cover Congressional action on Veterans Administration issues, the following are links to a sample of then-recent articles published on Military.com reporting on the VA: Caregivers Sue VA over Denial of Benefits <https://www.military.com/daily-news/2025/08/14/caregivers-sue-va-over-denial-of-benefits.html>; Watchdog Finds 50% Increase in VA Medical

- 14 -

61.57.The Wrap shrouded its reporting in the September 2025 Article in supposed quotes from biased sources, but had The Wrap met even the most basic journalistic standards for independent research or reporting, including the rudimentary step of reviewing the contents of Military.com, it would have discovered its claims about the demise of Military.com to be wholly unfounded.

62.58.The Wrap's false assertion of Military.com's demise was extremely harmful to Valnet and its affiliates, who depend on readership and advertising revenue for their businesses, like other digital media sites.

63.59.Further, the September 2025 Article makes several false statements regarding the treatment of employees at Military.com, accusing Valnet of mass layoffs of experienced journalists, publishing articles authored by freelancers lacking in journalism experience, and engaging in "union-busting" activities.  Valnet has done none of those things.

64.60.For example, contrary to Defendants' reporting in the September 2025 Article, Military.com journalists were not fired when Iron Corp acquired it.  Iron Corp made employment offers to all existing journalists, albeit most of whom declined to accept those offers.

65.61.Shockingly, the September 2025 Article's sole and self-referential "source" for its false allegation of "cruel" layoffs at Polygon, a Valnet publication, following its acquisition by Valnet is its own May 2025 Article earlier published by

---

Center Jobs with 'Severe' Shortages <https://www.military.com/daily-news/2025/08/13/watchdog-finds-50-increase-va-medical-center-jobs-severe-shortages.html>; VA to End Bargaining Agreement Contracts with Most Unions <https://www.military.com/daily-news/2025/08/07/va-end-bargaining-agreement-contracts-most-unions.html>; and VA to Ban Nearly All Abortions at VA Facilities, Drop Coverage for Procedure for Dependents <https://www.military.com/daily-news/2025/08/04/va-ban-nearly-all-abortions-va-facilities-drop-coverage-procedure-dependents.html>>.

THIRD AMENDED COMPLAINT

~~The Wrap~~TheWrap.  In fact, those layoffs occurred under the ownership of Polygon's prior owner, Vox Media, and not under Valnet's ownership.

~~66.~~62. Further, the claim that Valnet has engaged in "union busting" is false. There is no collective bargaining agreement between Iron Corp or Valnet and the Military.com staff.  Iron Corp acquired Military.com free and clear of any liabilities or obligations.  Thus, there is and was no union to "bust~~.~~."

~~67.~~63. The May 2025 and September 2025 Articles, having been published in the wake of the controversy the March 2025 Article precipitated, reflect Defendants' refusal to obtain and publish true facts regarding Youssef and Valnet.

~~68.~~64. Any ordinary reader would be convinced by the combined effect of TheWrap's Articles that Valnet is a toxic workplace and that Valnet fails and ruins the businesses it acquires and operates.  These smears limit Valnet's ability to recruit readers and employees and attract advertisers, thereby providing The Wrap with a commercial advantage against one of its principal industry competitors.

~~69.~~65. Not surprisingly, The Wrap's defamatory content has been picked up and repeated by other outlets.  For example, on September 15, 2025, Isaac Cubillos published what purports to be an opinion piece on TheMilitaryReport.com, titled "The Gutting of Military.com: From Battle-Tested Journalism To ClickBait Casualty."[6] The Military Report Article utilizes TheWrap's March 2025 Article and September 2025 Article as sources for several false statements of fact, including that Valnet is "gutting" Military.com and "stripp[ing it] for parts," that Valnet caused Military.com to be "gutted by layoffs, drained of seasoned journalists," and that "[i]n the weeks following Valnet's takeover, a wave of layoffs, buyouts and resignations swept the newsroom." Relatedly, TheMilitaryReport.com Article falsely asserts that "Valnet's Business

---

[6] *See* <https://themilitaryreport.com/opinion/the-gutting-of-military-com-from-battle-tested-journalism-to-clickbait-casualty> (the "Military Report Article~~") (last visited Feb. 11, 2026).~~").

THIRD AMENDED COMPLAINT

Model" is to "fire seasoned journalists," "hire cut-rate  freelancers," and "prioritize SEO and clicks."

70.66. The Military Report's republication of false facts from the March 2025 and September 2025 Articles has caused significant additional reputational harm to Valnet.

**F.    Gonzalez Utilizes His Personal Social Media Account to Continue the Onslaught Against Valnet and Youssef**

71.67. Following the March 2025 Article's publication, Gonzalez continued to target Valnet on his personal social media account, amplifying his defamatory mischaracterizations of Valnet and Youssef.

72.68. In a post on X dated August 1, 2025, Gonzalez reposted the March 2025 Article calling it a "PSA on the former pornographers who continue to exploit their staffersstaff."   A true and correct screenshot of this post on X is attached hereto as Exhibit "D."

73.69. Gonzalez has since made additional damaging posts about Valnet that repeat the harmful narratives he previously published in TheWrap. Attached hereto collectively as Exhibit "E" are true and correct copies of screenshots of the relevant posts.

**G.    Defendants' Articles and Postings Have Injured Youssef**

74.70. The Articles have already caused injury to both Youssef and Valnet, and will continue to do so.

75.71. Prior to the Articles and postings, Youssef enjoyed a positive reputation in both his personal and professional lives.

76.72. The Articles and postings, and the defamatory statements they contain, have undermined Youssef's credibility, trustworthiness, and business relationships. This reputational harm inhibits Youssef's ability to operate his otherwise successful business.

THIRD AMENDED COMPLAINT

77.73. The statements about ~~Youssef's~~Youssef's character, including the false ~~and misleading connection drawn between him and the Video scandal and the false~~ allegations that he was involved in impliedly criminal "money laundering~~",~~," are extremely prejudicial.

78.74. Youssef has already observed a loss of trust and credibility amongst his peers in the business community, causing Youssef monetary harm.

79.75. Youssef has also seen ramifications extending to his personal life and adversely affecting various aspects of his relationships with others.

80.76. The implications for Youssef's personal and professional life have caused Youssef tremendous emotional distress – affecting (among other things) his mood, temperament, and his ability to sleep.

**H.      Defendants' Articles and Postings Have Injured Valnet**

81.77. Valnet is a leader in the digital media publication industry.  The Company's 27 publications and brands have hundreds of millions of readers and viewers each month and generate billions of advertising impressions each month.

82.78. Valnet relies on strategic partnerships for business development. Valnet further relies on its reputation as a supporter of high-quality journalism and of talented writers and editors to staff its ever-growing business and need for engaging and well-written content, and to grow its business through mergers and acquisitions.

83.79. The combined effect of the Articles and postings has a negative impact on Valnet's business. The repeated false assertion that Valnet ruthlessly lays off staff and contributors from its publications presents a serious obstacle to future acquisitions and partnerships.

84.80. Valnet has already seen the Articles and postings, and the false statements they contain, impair Valnet's ability to recruit new employees and contractors. For example, Valnet was in the process of hiring two employees for senior editorial roles, when, in the days immediately following the publication of the March 2025 Article, the candidates abruptly declined Valnet's employment offers, explicitly citing or

alluding to the March 2025 Article, and the negative publicity created by the false statements therein, as all or part of the reason they declined their offers.

85.81. The March 2025 Article has also circulated on a Facebook page for freelance journalists titled "Freelance Game Journo Network."  Upon information and belief, the defamatory statements in the March 2025 Article, as well as the two follow-up Articles, have impacted and will continue to impact Valnet's ability to hire writers and editors to create the content that is essential to Valnet's business.

86.82. Valnet executives have also had to address concerns from multiple business partners and potential partners. These partners have expressed concerns about the false allegations in the March 2025 Article, and certain pending transactions between these partners and Valnet have been held up and/or placed into question as a result.

87.83. For example, prior to the March 2025 Article, Valnet was in the midst of negotiating a multimillion-dollar financing transaction with a major financial institution.  The transaction was moving smoothly toward closure until the March 2025 Article's publication, after which the financial institution began asking questions about the Article and expressing concerns.  The institution later informed Valnet that it would not move forward to close the transaction, citing the false and misleading March 2025 Article as its reason.

88.84. In addition, Valnet had partnered with a prominent film industry business to host a series of film screenings, several of which had already occurred in association with one of Valnet's entertainment website brands, Collider. Following the success of these initial screenings, Valnet and the partner discussed a significant expansion of the series and associating Valnet's name with this valuable business opportunity.  After the publication of the March 2025 Article, however, the partner declined to advance those plans and stated that it was no longer comfortable having Valnet's name associated with the series, in light of the negative publicity Valnet has received from the March 2025 Article and the defamatory statements it contained.

THIRD AMENDED COMPLAINT

89.85.Upon information and belief, shortly after the partner withdrew from its plans to expand the screening series and to attach Valnet's name to the series, TheWrap and Gonzalez began contacting that partner and another Valnet industry partner, a prominent film studio, specifically calling the studio's attention to the March 2025 Article and making the studio aware of the Article for the first time.  Upon information and belief, The Wrap and Gonzalez did so in bad faith, with an improper purpose of inflicting harm on Valnet, and not in furtherance of any true journalistic activity.  Within days of these communications from The Wrap and Gonzalez, the studio insisted on canceling an upcoming screening, precluding Valnet from realizing any benefit from this business opportunity.

86.    FurtherSubsequent to the publication of the May 2025 Article, a prospective employee who interviewed for a position with Valnet's ScreenRant publication asserted that Valnet discriminates against female employees—mirroring many of the false and defamatory allegations made in that May 2025 Article—and thereby reflecting the reach, influence, and impact of those allegations upon Valnet's ability to successfully recruit new employees.

87.    Shortly after the acquisition of Military.com in or about August of 2025, Valnet is informed and believes that the confluence of the false and defamatory allegations contained in the March 2025 Article and the May 2025 Article resulted in the departure of at least two of Military.com's key contract writers which, in turn, led directly to the sunsetting of two revenue-generating content programs—the Veteran Employment Project and the "Ask Lacey" Series—valued collectively at approximately $400,000.  In addition, at least two other contractors who resigned in 2025 cited public perception and organizational reputation as primary factors in their departures.

88.    In the run-up to the publication of the September 2025 Article, Gonzalez authored a post on X (formerly Twitter) in which he disparaged Iron Corp's attempt to

THIRD AMENDED COMPLAINT

hire "for several key editorial positions" at Military.com by publicizing a claim that these recruitment efforts were "seemingly aimed to union bust."

89.    Subsequent to the publication of the September 2025 Article, Valnet also reached out to acquire a premier digital business that served dedicated communities. That outreach was rebuffed by the target company's chief executive officer who cited "coverage of the Military.com acquisition and TheWrap's reporting from 2025" as a reason for not moving forward, cautioning that such reporting "would be a real headwind for any advisor-facing property under that ownership."

90.    Also subsequent to the publication of the September 2025 Article, Valnet pursued the potential acquisition of an online gaming marketplace. That company's representative was hesitant to discuss such a potential acquisition by Valnet because he had seen articles regarding the acquisitions of Polygon.com and Military.com which contained complaints of unhappiness with post-transactions layoffs. As a result, no further acquisition talks ensued.

91.    Following publication of the September 2025 Article, the negative perception generated by its accusations has also resulted in a measurable decline in Military.com's revenue, the termination of high-value editorial programs, and precipitated a significant strain on key institutional partnerships. To date, Valnet estimates that approximately $500,000 in revenue losses and projected shortfalls is attributable to these false and defamatory statements. These include:

    a.  A reduction of $90,000 in year-over-year advertising spending by United Services Automobile Association (USAA);

    b. The pausing of specific advertising campaign elements by National University, leading to a project loss of $25,000-$50,000 in 2025;

    c. The fourth-quarter 2025 pause of business from Refuel Agency due to concerns about Military.com's stability in the wake of the September 2025 Article's claims; and

THIRD AMENDED COMPLAINT

d. Impairment of the working relationship and institutional trust between Military.com and another of its prominent advertisers, the Navy Federal Credit Union (NFCU).

92.    Also following publication of the September 2025 Article, Military.com's ability to acquire top-tier talent has been severely hampered. Feedback from prominent industry writers and military/veteran journalists indicates that the site has now been "blacklisted" among high-level contributors due to the false and defamatory claim that Iron Corp has removed veteran voices from the Military.com team. As a result, significant bandwidth was diverted from strategic growth opportunities in order to focus exclusively upon damage control precipitated by the September 2025 Article. These efforts have included intensive email correspondence, phone consultations, and high-level meetings with clients, industry leaders, and internal staff to correct falsehoods, stabilize morale, and preserve fractured relationships. All of this has necessitated a redirection of resources that has resulted in stalling several 2026 planning initiatives.

90.93. Finally, Valnet's revenues are primarily driven by advertising, which itself is driven by readership. Upon information and belief, the Articles and the false statements therein have created negative publicity for Valnet and its publishing businesses, which, on information and belief, have caused and will continue to cause Valnet to lose readership and advertising revenue. Negative publicity from the false and misleading Articles, thus, has thus directly resulted in, and will continue to directly result in, financial losses for Valnet.

**COUNT I**
**(Libel *Per Se*)**
**(On Behalf of Both Plaintiffs Youssef Against Both Defendants)**

91.94. Plaintiffs repeat, reallege, and incorporate by reference the allegations in each of the foregoing paragraphs as though fully set forth herein.

- 22 -

92.95. In March 2025, The Wrap published the March 2025 Article, which was authored by Gonzalez.

93.96. The March 2025 Article and the statements therein were of and concerning Youssef and Valnet.

94.97. The March 2025 Article falsely and irresponsibly accused Youssef and Valnet of improper conduct, impugning Youssef personally and his Valnet business, and intentionally damaging both of their reputationshis reputation.

95.98. The March 2025 Article contained false statements and misleading omissions concerning Youssef, namely: that (1) Youssef "ventured into content creation after exiting an online porn business . . . that ended with a $6 million seizure of their funds by the Secret Service for alleged money laundering in 2009 before paying a $2.2 million fine"; and (2) Youssef was part of a group which included Matt Keezer that created the paysite "Brazzers. . . .  In January 2007, Keezer bought the domain name pornhub.com for $2,750 and went online through a separate company called Interhub.  The Brazzers group were silent partners.  But Interhub ran into trouble in 2009 when British teenager Rose Kalemba discovered her rape as a 14-year-old broadcast on Pornhub.  Kalemba pleaded to have the content removed for over six months, but was ignored.  Kalemba's rape was viewed over 400,00 [sic] times."

96.99. TheseThe false and misleading statements and omissions  suggesting assertion—that Youssef or his previous businesses have been accused of money laundering and/or were involved in Pornhub's failure to remove the Video after the victim's pleas to do so  exposeexposes Youssef and Valnet to public contempt, aversion or, and disgrace.

97.100.    In publishing the March 2025 Article, The Wrap was acting in bad faith, for an improper purpose, with the intent to cause injury to Youssef and Valnet.

98.101.    As the March 2025 Article acknowledges, Youssef is "little known," has maintained a low profile, and has not inserted himself into any public controversies.  Youssef is thus a private figure.

THIRD AMENDED COMPLAINT

99.102.    Even assuming Youssef were a public figure, however, Defendants' misconduct exceeds ordinary negligence.  The Wrap published the March 2025 Article with actual malice, knowing of the explicit and implicit falsity of statements thereinits accusation, and/or with reckless disregard for theits truth or falsity of those statements.

100.103.    As a result of Defendants' conduct alleged herein, Youssef has suffered and will continue to suffer economic and non-economic losses, including lost earnings, harm to his name and reputation, humiliation, and emotional distress in an amount to be determined at trial.

101.  In addition, Valnet has suffered and will continue to suffer economic and non-economic losses, including lost revenues, and impairment to its name and reputation.

102.104.    Further, Defendants' conduct was wanton and willful, justifying an award of punitive damages.

103.105.    Unless enjoined and restrained by the Court, Defendants will republish, repeat, and continue to disseminate the aforementioned statementsfalse accusation to the continuing injury of Plaintiffs;Youssef; and that such continued republication, repetition, and dissemination of thesesuch a defamatory and offensive falsehoodsfalsehood will cause irreparable harm to PlaintiffsYoussef by damaging their reputationhis reputation and adversely affecting theirhis business efforts. Plaintiffs lackYoussef lacks an adequate remedy at law insofar as damages will be very difficult to calculate for such ongoing injuries. By reason of the foregoing, Plaintiffs areYoussef is entitled to a permanent injunction enjoining and restraining Defendants, and all persons acting in concert with them, from republishing, repeating, distributing, or otherwise disseminating the defamatory statementsstatement.

- 24 -

THIRD AMENDED COMPLAINT

## COUNT II
### (Libel *Per Se*)
### (On Behalf of Plaintiff Valnet Against Both Defendants)

104.106.    Plaintiff Valnet repeats, realleges, and incorporates by reference the allegations in each of the foregoing paragraphs as though fully set forth herein.

105.107.    In May 2025, The Wrap published the May 2025 Article, which was authored by Gonzalez.

106.108.    The May 2025 Article and the statements therein were of and concerning Valnet.

107.109.    The May 2025 Article falsely accused Valnet of improper conduct, impugning thereby damaging Valnet's business and intentionally damaging its reputation.

108.110.    The May 2025 Article contained false statements and misleading omissions concerning Valnet, namely, that: (1) Mars Monnier, Valnet's general manager, told Lissette Lanuza-Saenz that "It's not our job to accommodate for her [a "disabled female staffer"]," and that "You're being a problematic and emotional woman" and "You need to calm down"; (2) Acting in alleged conformity with the proclivities of the "Valnet hierarchy," Monier "is a misogynist" who "passed over [Lanuza-Saenz] for a promotion given to a man she believed was less qualified"; (3) Valnet "laid off 75% of the CBR [comic book news site's] staff, about two dozen people in 2023"; and (4) Jeannette White, CBR's lead movie features editor, was "demoted without warning and my emails to HR [CBR's Human Resources department] [went] left unanswered."

109.111.    These false and misleading statements—suggesting that Valnet is a "toxic workplace" with a "toxic work environment" that engages in gender discrimination, and cannot appropriately operate its businesses— expose Valnet to public contempt, ridicule, aversion, and disgraceimpair Valnet's ability to conduct its publishing business.

- 25 -
THIRD AMENDED COMPLAINT

110.112.    Not only does this limit Valnet's ability to recruit and retain readers and employees and to attract advertisers, but The Wrap's smearing of Valnet has a direct positive impact on its own business, providing The Wrap with a commercial advantage against one of its principal industry competitors.

111.113.    In publishing the May 2025 Article, The Wrap was acting in bad faith, for an improper purpose, with the intent to cause injury to Valnet.

112.114.    Defendants' misconduct exceeds ordinary negligence.  The Wrap published the May 2025 Article with actual malice, knowing of the explicit and implicit falsity of statements therein, and/or with reckless disregard for the truth or falsity of those statements.

113.    As a result of Defendants' conductmisconduct alleged herein, Valnet has suffered and will continue to suffer economic and non-economic losses, including lost revenues, withdrawn and/or negated acquisition and other business opportunities, impairment toof its name and reputation, and other non-economic damages.

114.115.    Further, ability to recruit and retain qualified employees, adversely impacting its ability to attract readers and advertisers while simultaneously providing a competitive advantage to Defendants, as well as all other sums that Valnet has expended and will expend as a result of Defendants' conduct was wanton and willful, justifying an award of punitive damages. misconduct.

115.116.    Unless enjoined and restrained by the Court, Defendants will republish, repeat, and continue to disseminate the aforementioned statements to the continuing injury of Plaintiff;Valnet; and that suchthe continued republication, repetition, and dissemination of thethese defamatory and offensive falsehoods will cause irreparable harm to Plaintiff by damaging its reputation andValnet by adversely affecting its business efforts. Plaintiff Valnet lacks an adequate remedy at law insofar as damages will be very difficult to calculate for such ongoing injuries.  By reason of the foregoing, PlaintiffValnet is entitled to a permanent injunction enjoining and

- 26 -

restraining Defendants, and all persons acting in concert with them, from republishing, repeating, distributing, or otherwise disseminating the defamatory statements.

**COUNT III**
**(Libel *Per Se*)**
**(On Behalf of Plaintiff Valnet Against Defendant The Wrap)**

116.117.    Plaintiff Valnet repeats, realleges, and incorporates by reference the allegations in each of the foregoing paragraphs as though fully set forth herein.

117.118.    In September 2025, The Wrap published the September 2025 Article.

118.119.    The September 2025 Article and the statements therein were of and concerning Valnet.

119.120.    The September 2025 Article falsely accused Valnet of improper conduct, impugning thereby damaging Valnet's business and intentionally damaging its reputation.

120.121.    The September 2025 Article contained false statements and misleading omissions concerning Valnet, namely, that: (1) Valnet undertook mass layoffs of experienced journalists; (2) Military.com was "dead"—at Valnet's hands; and (3) Valnet engaged in "union-busting" activities.

121.122.    These false and misleading statements and omissions—suggesting that Valnet is a toxic workplace and that Valnet fails and ruins the businesses it acquires and operates—expose Valnet to public contempt, aversion or disgraceimpairs Valnet's ability to conduct its publishing business.

122.123.    Not only does this limit Valnet's ability to recruit and retain readers and employees and to attract advertisers, but The Wrap's smearing of Valnet has a direct positive impact on its own business, providing The Wrap with a commercial advantage against one of its industry competitors.

123.124.    In publishing the September 2025 Article, The Wrap was acting in bad faith, for an improper purpose, with the intent to cause injury to Valnet.

THIRD AMENDED COMPLAINT

124.125.    Defendant'sThe Wrap's misconduct exceeds ordinary negligence. The Wrap published the September 2025 Article with actual malice, knowing of the explicit and implicit falsity of statements therein, and/or with reckless disregard for the truth or falsity of those statements.

125.   As a result of Defendant's conductThe Wrap's misconduct alleged herein, Valnet has suffered and will continue to suffer economic and non-economic losses, including: lost revenues,advertising and other revenue streams; withdrawn and/or negated acquisition and other business opportunities; termination of high-value editorial programs; impairment toof its name and reputation, and other non-economic damages.

126.   Further, Defendant's conduct was wantonability to recruit and willful, justifying an award of punitive damages. retain a range of resources, including qualified employees, freelancers, and other independent contractors; adversely impacting its ability to attract readers and advertisers while simultaneously providing a competitive advantage to The Wrap; straining key institutional partnerships; and all other sums that Valnet has expended and will expend as a result of The Wrap's misconduct.

127.   Unless enjoined and restrained by the Court, DefendantThe Wrap will republish, repeat, and continue to disseminate the aforementioned statements to the continuing injury of Plaintiff;Valnet; and that such continued republication, repetition, and dissemination of the defamatory and offensive falsehoods will cause irreparable harm to Plaintiff by damaging its reputation andValnet by adversely affecting its business efforts. Plaintiff Valnet lacks an adequate remedy at law insofar as damages will be very difficult to calculate for such ongoing injuries. By reason of the foregoing, PlaintiffValnet is entitled to a permanent injunction enjoining and restraining Defendant,The Wrap,, and all persons acting in concert with it, from republishing, repeating, distributing, or otherwise disseminating the defamatory statements.

THIRD AMENDED COMPLAINT

**COUNT IV**
**(Copyright Infringement)**
**(On Behalf of Plaintiff Valnet Against Defendant The Wrap)**

128. Plaintiff Valnet repeats, realleges, and incorporates by reference the allegations in each of the foregoing paragraphs as though fully set forth herein.

129. Valnet owns the copyrights in the two original Images.

130. Each of the Images is copyrightable subject matter under the laws of the United States.

131. Neither of the Images is a United States work as defined by the Copyright Act, and so copyright registrations are not required for these works.

132. Access is not required to establish copyright infringement of a work by identical or strikingly similar works, but even if it were, The Wrap had ample, unrestricted access to each of the Images through the publicly- accessible websites on which the Images originally appeared.

133. In publishing the March 2025 Article, The Wrap reproduced and publicly displayed Valnet's copyrighted Images.

134. The Wrap never asked permission or received authorization from Valnet to reproduce, publicly display or otherwise use the Images, whether in connection with the March 2025 Article or otherwise.

135. The Wrap had no legal justification for using or reproducing or displaying the Images in the March 2025 Article without authorization from Valnet.

136. The Wrap's actions violate Valnet's exclusive rights under the Copyright Act and constitute copyright infringement.

137. As a direct and proximate result of The Wrap's copyright infringement, Valnet is entitled to recover damages it will and has sustained, and any gains, profits, and advantages obtained by The Wrap as a result of its acts of infringement as alleged above. At present, the amount of such damages, gains, and profits cannot be fully ascertained but will be established at trial.

- 29 -
THIRD AMENDED COMPLAINT

138.   In addition, Valnet is entitled to injunctive relief prohibiting The Wrap's further infringement of the Images.

**COUNT V**
**(Tortious Interference with Prospective Economic Advantage)**
**(On Behalf of Plaintiff Valnet Against ~~Defendant The Wrap~~Both Defendants)**

139.   Plaintiff Valnet repeats, realleges, and incorporates by reference the allegations in each of the foregoing paragraphs as though fully set forth herein.

140.   Prior to ~~Defendant The Wrap's~~Defendants' wrongful actions, Valnet enjoyed economic relations with numerous business partners, which Valnet reasonably expected would continue to result in economic benefits to Valnet.

141.   These economic relations include, but are not limited to: two candidates for senior editorial roles and other potential employees; a multi-million-dollar financing transaction with major financial institution~~;~~, and~~;~~ a prominent film industry business with whom Valnet had previously partnered to host a series of screenings and was discussing additional future screenings.

142.   ~~The Wrap~~Defendants had knowledge of these relationships and intentionally interfered with these relationships by making false and defamatory statements about Valnet to these business partners, and urging those partners to reconsider collaborating with Valnet.  Upon information and belief, such false and defamatory statements and insinuations were in addition to those contained within the Articles.

143.   By engaging in this conduct, ~~The Wrap~~Defendants intended to disrupt Valnet's relationships with its business partners and potential employees and/or knew that disruption of the relationships was certain or substantially certain to occur.

144.   Valnet's relationships with its business relations and potential employees have been disrupted, and Valnet has suffered and will continue to suffer substantial and irreparable damage as a direct result of ~~The Wrap's~~Defendants' conduct, including economic losses and reputational damage.

- 30 -

145. Among other things, Valnet's screening series partner and a prominent film studio were prepared to enter certain beneficial business relationships with Plaintiff but were dissuaded from doing so by ~~The Wrap's~~Defendants' wrongful actions described herein.

146. In addition, a major financial institution, dissuaded from moving forward by the Articles and Defendants' other actions, backed out of a multi-million-dollar financing transaction for Valnet that had been moving smoothly toward completion.

147. ~~The Wrap's~~Defendants' conduct was willful, wanton and malicious in that it acted in conscious disregard of Valnet's rights. As a competitor of ~~Valnet's, The Wrap was~~Valnet, Defendants were aware that making false and defamatory statements about Valnet to its business partners, and that otherwise interfering with its actual and prospective business relationships, would adversely affect Valnet's rights and would be looked down upon and despised by reasonable people. Accordingly, Valnet is entitled to exemplary and punitive damages against ~~The Wrap~~Defendants in an amount sufficient to punish and deter ~~it~~them.

## COUNT VI
**(Unfair Business Practices—Cal. Bus. & Prof. Code § 17200 *et seq.*)**
**(On Behalf of Plaintiff Valnet Against ~~Defendant The Wrap~~Both Defendants)**

148. Plaintiff Valnet repeats, realleges, and incorporates by reference the allegations in each of the foregoing paragraphs as though fully set forth herein.

149. The California Unfair Competition Law (the "UCL"), which is codified under California Business and Professions Code sections 17200 et seq., prohibits acts of "unfair competition," including any unlawful, unfair, fraudulent, or deceptive business act or practice.

150. ~~The Wrap has~~Defendants have engaged in unfair and unlawful, deceptive, and unfair business practices, as proscribed by California Business and Professions Code sections 17200 et seq., including those set forth herein. Defendants have done so for two integrally related purposes—to inflict harm upon Valnet by causing readers and

THIRD AMENDED COMPLAINT

advertisers to abjure its entertainment-oriented publications, while simultaneously encouraging readers and advertisers to turn to and support TheWrap's entertainment industry coverage—including stories authored by Gonzalez, the "senior film reporter at TheWrap covering film & television development, agencies and talent."

151.   In addition to, and apart from the Articles themselves, Valnet is informed and believes that prospective employees and other personnel who were contemplating being hired by Valnet were instead solicited, induced to, and accepted competitive employment offers from The Wrap.

152.   Moreover, and to the best of Plaintiffs' knowledge, Defendants had never published any stories about either Valnet's business operations or the background/personal history of Mr. Youssef prior to the appearance of the March 2025 Article.  However, shortly before publication of the March 2025 Article, Valnet and The Wrap engaged in ultimately unsuccessful discussions by which Valnet sought to acquire The Wrap.  When those negotiations failed to yield an acquisition agreement, Valnet is informed and believes that Defendants embarked upon a wide-ranging campaign to denigrate and vilify Valnet in the entertainment industry community while seeking to improve its own competitive standing within that community.   Valnet is informed and believes that Defendants did so by, among other things: contacting the prominent film industry business partner that had collaborated with Valnet in hosting (and was planning to continue hosting) a series of film screenings in order to dissuade that partner from doing so; and by likewise contacting a prominent film studio with the goal of inducing it to cancel an upcoming screening.  These efforts proved successful and redounded to the economic detriment of Valent and to the concomitant and consequent benefit of Defendants.

~~151.~~153.   As a direct, legal, and proximate result of these unlawful acts and practices, ~~The Wrap has~~Defendants have reaped, and ~~continues~~continue to reap, the benefits of ~~its~~their ill-gotten gains.

152.154.     By virtue of the direct injuries that Valnet sustained as a result of The Wrap'sDefendants' wrongful conduct, Valnet is entitled to remedies that are available to it under the UCL, including disgorgement and/or restitution.

THIRD AMENDED COMPLAINT

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Valnet Inc. and Hassan Youssef respectfully request that this Court enter judgment against Defendants The Wrap News Inc. and Umberto Gonzalez as follows:

A.    On Count I against both Defendants, for damages in an amount to be determined at trial, but in no event less than $1.5 million to Youssef and $30 million to Valnet;

B.    On Count II against both Defendants, for damages in an amount to be determined at trial, but in no event less than $30 million to Valnet;

C.    On Count III against Defendant The Wrap only, for damages in an amount to be determined at trial, but in no event less than $30 million to Valnet;

D.    On Count IV, V and VI against Defendant The Wrap only, for damages in an amount to be determined at trial;

E.    On Counts V and VI against both Defendants, damages in an amount to be determined at trial;

E.F.   On Count VI against The Wrap only, for restitution and disgorgement of all monies and profits acquired by The Wrap as a result of its unfair competition;

F.G.   For an award of costs and disbursements of this action;

G.H.   For punitive damages in an amount to be determined at trial but in no event less than $3 million;

H.I.   For permanent injunctive relief barring Defendants from further publishing the false and misleading Articles, mandating that Defendants publish a corrective statement in connection therewith, and barring Defendants from infringing Valnet's copyrights in the Images and further tortiously interfering with Valnet's business relationships; and

I.J.    For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs request a trial by jury on all matters so triable.

DATED: February 11, 2026        NOLAN HEIMANN LLP

                                By:   s/ Douglas Mirell
                                      NOLAN HEIMANN LLP

DATED: May 12, 2026

                                      By: s/ Douglas E. Mirell
                                      Douglas E. Mirell
                                      Jordan D. Susman
                                      16000 Ventura Blvd., Ste. 1200
                                      Encino, CA 91436
                                      (818) 574-5710
                                      dmirell@nolanheimann.com
                                      jsusman@nolanheimann.com
                                      dmirell@nolanheimann.com
                                      jsusman@nolanheimann.com

                                      DAVIS+GILBERT LLP
                                      Ina B. Scher (admitted pro hac vice
                                      forthcoming)
                                      David Greenberg (pro hac vice forthcoming)
                                      1675 Broadway
                                      New York, New York 10019
                                      (212) 468-4800
                                      ischer@dglaw.com
                                      dgreenberg@dglaw.com
                                      ischer@dglaw.com

                                      *ATTORNEYS FOR PLAINTIFFS*

- 35 -

THIRD AMENDED COMPLAINT

- 36 -

THIRD AMENDED COMPLAINT